1820.

CAMPBELL
v.
MACOMB.

---

### CAMPBELL and others *against* MACOMB and others.

If mortgaged premises are incapable of being sold in parcels, or of being divided, without injury, the whole may be sold, though the whole of the debt is not due; and the proceeds applied to pay the *interest and costs,* and the surplus to the discharge of the principal of the debt.

Where, in such case, the bond having become forfeited at law, for the non-payment of the interest, the whole mortgaged premises are decreed to be sold, and the mortgagor, or the purchaser of the equity of redemption, before the day of sale, pays the interest and costs, the sale will be stayed; but the decree of foreclosure entered, will remain as further security, to enforce the payment of the future interest, and the instalments of the principal, as they respectively become due.

Though the mortgagee is not only a *trustee,* but a *surety* for the debt, and though the mortgaged premises are in a state of ruin and decay, in consequence of storms, and the security thereby impaired, and rendered precarious, he is not, therefore, entitled to have the property sold, before the debt is due, or the debtor is in default.

Nor will this Court, where the premises, being a dam and bridge, were injured by storms, interfere to compel the mortgagor in possession, to repair them at his own expense.

*August 7th.*

A DECREE was entered in this cause, on the 13th of *June,* 1820, on the coming in of the Master's report, [by which it appeared, that there was due to the plaintiffs, as trustees of a charity school, on two bonds and mortgages in the pleadings mentioned, for interest, 1,575 dollars. That the principal of the said bonds, being in the whole, 10,000 dollars, would not be due until the year 1825, but the bonds

had became forfeited at law, by the non-payment of interest, and that there was due to the plaintiff, *Campbell*, 27,499 dollars 98 cents, on two judgments, and that the mortgaged premises were manifestly indivisible, and could not be sold in parcels,] that the mortgaged premises, being a stone dam, and bridge, across *Harlaem* river, be sold, and that the proceeds be applied to discharge the costs of suit, and then the interest due, and then the principal of the said bonds and mortgages, though not due, and the residue, if any, towards payment of the two judgments in favour of the plaintiff, *Campbell*. Before the day of sale, *John Mowatt*, jun. the purchaser of the equity of redemption, belonging to the two mortgages, paid all the arrears of interest, and the costs due, and an order was entered, upon his application, staying the sale.

A petition was now presented, on the part of the plaintiff, *Campbell*, stating, that he is personally bound, as collateral security, to the trustees of the charity school, for the payment of the bonds and mortgages. That he holds two judgments against the defendant, *Macomb*, for moneys advanced, and for his indemnity as such security. That the other defendants were owners of the equity of redemption. That *Macomb* is insolvent, and the dam much injured by a storm, since the filing of the bill, and now in danger of being destroyed. That the security for the principal of the mortgage debts, is much impaired. That the defendants, who were then owners of the equity of redemption, agreed to the decree of sale. The petitioner concluded with a prayer, that the defendant, *Macomb*, or *Mowatt*, be ordered to give security to repair the dam, or to repay the mortgage debt with interest, or that the order staying the sale be vacated.

*J. I. Roosevelt*, jun. for the motion, on behalf of the petitioner.

1820.

CAMPBELL
v.
MACOMB.

1820.

CAMPBELL
v.
MACOMB.

*J. Smith*, contra. He read an affidavit of the defendant *Macomb*, stating, that *Mowatt*, the present owner of the equity of redemption, was rebuilding the dam, and would, probably, finish it in two months.

THE CHANCELLOR. The sale of the whole of the mort-gaged premises was indispensable in this case, because they were not capable of being sold in parcels, or of being divided, without manifest injury to all the parties concerned. When the whole premises are thus necessarily sold, it is the direction of the statute, (1 *N. R. L.* 490.) that *the Court apply the proceeds of the sale not only in payment of the interest, instalment, or portion due, but towards payment of the whole, or residue of the demand, which hath not become due, or payable, provided the same bears interest.* But this provision is made for the necessity of the case, and more than is due is not to be raised out of the mortgaged premises, when that necessity does not exist. If the mortgagor, or the party holding the equity of redemption, comes before the sale, and brings in the amount due, with costs, there is no justice or equity in suffering the sale to proceed. It has been the practice of the Court, since I have sat here, to stay the sale in such cases, and to let the decree of foreclosure remain good to enforce payment of the future interest and instalments, as they may respectively become due. When such an application was made, before answer, in *Lansing* v. *Capron*, (1 *Johns. Ch. Rep.* 617.) I required, as a condition of the rule, a decree of foreclosure to be entered by way of security, and to save the trouble and expense of a new suit ; but this is the utmost length to which any proceeding in the cause has been carried, after payment of the amount due, with the costs.

Though there be a regular decree of sale in this case, there can be no doubt of an adequate power in the Court, in its discretion, to regulate the process of execution under the decree. To sell, after satisfaction of the decree, would

be gross abuse; and the whole inducement to the sale is to obtain satisfaction of the sum *actually due.* The object of the decree was not to raise any part of the debt not due; yet, the raising of the entire debt may become an unavoidable consequence of the sale, because, the Court, in order to raise what is due, is obliged to sell the whole of the mortgaged premises, as they happen to consist of one entire subject, incapable of being conveniently, or safely divided. If this necessity can be avoided, before the sale, by the voluntary payment of what is due, the present object of the decree is satisfied, and all that the party can, in conscience, require, is, that it may remain as a security, for subsequent defaults, and afford him an easy and prompt remedy, when they occur.

A Court of law, after judgment and execution for the entire debt, will relieve the defendant, on paying the instalment due, but will retain the judgment as a security for the future instalments. (*Judd* v. *Evans*, 6 *Term Rep.* 399.) This is an equitable construction of the statute of 4 *Anne*; and surely this Court will not turn a deaf ear to the equity of the case, and adopt a more than common law rigour.

But the petition states, that the petitioner is not only a mortgagee in trust, but a surety for the mortgagor, and that the mortgaged premises are in a state of injury and decay, from the action of storms, and have thereby become a precarious security. I do not perceive that this circumstance gives him any right or title, in equity, to have the premises sold for a debt not due. The security was taken with knowledge of the situation and character of the property, and of the risks to which it was exposed. It does not belong to the Court to give a party better security than he elected to take, where there has been no fraud or mistake, nor any abuse or waste of the subject. I am not informed that there exists any precedent of a bill *quia timet*; adapted to such a case.

1820.

CAMPBELL
v.
MACOMB.

1820.

CAMPBELL
v.
MACOMB.

All the cases in the *English* law, in which even a surety may file a bill *quia timet*, are those in which the *debt was due* from the principal debtor; and I do not know of any principle of equity that will justify us in giving aid to the surety, before the debt is due, when the parties have not provided, in their contract, for such a case.

The question on this subject, so often raised in the civil law, assumed the fact, that the principal debtor was in default; *Si diu in solutione reus cessavit ;* and when it is added, *aut certe bona sua dissipavit*, the reference was still to the case in which the debtor had failed to pay, and was, also, wasting his goods. I apprehend, this must be the true construction; for the only question raised by *Marcellus*, in the text referred to, (*Dig.* 17. 1. 38. 1.) was, whether the surety could seek indemnity before he had himself paid, *fide jussor an et prius, quam solvat, agere possit, ut liberetur ?* It was a very equitable provision in the civil law, to afford a remedy to the surety when the debtor neglected to pay, though the creditor had not required payment, and though the surety had not actually advanced the debt; but it would not have been very just to have given the surety an action for indemnity against the debtor, before the latter was in default, and when such a previous claim made no part of the original contract. The debtor, as the civil law truly observes, in another place, (*Dig.* lib. 17. 1. 22. 1.) has an interest not to be compelled to pay before the day ; and yet, I perceive, that several writers on the civil law (*Domat.* part 1. b. 3. tit. 4. sec. 3. n. 3. *Wood's Institutes of the Civil Law*, p. 227. *Brown's Lectures on the Civil Law*, vol. 1. 362.)(*a*) refer to this very text to prove, that if the surety be

*By the civil law, a surety cannot sue the principal debtor for his indemnity or discharge, before the term of payment given to the debtor, by his contract with the creditor, has expired; though the surety may, after the time of payment has elapsed, sue the debtor for his indemnity, in certain cases, before he has himself paid the debt.*

---

(*a*) There must be some misapprehension of the meaning of the text, on the part of these writers, or the opinion of *Marcellus*, (*Dig.* lib. 17. tit. 1. 38.) to which they refer, is irreconcilable with principles laid down in other parts of the Digest. In the case stated in the text, *Titius* was part owner of a house, which, by his consent, was mortgaged to the creditor by his natural son *Mævius*. *Mævius* died, and the question which

in peril, he may sue *before the time of payment*, to be indemnified or discharged. It may be so, but these writers refer to no other text but that already cited, and that certainly does not, by any necessary interpretation, warrant the doctrine. Indeed, it seems to preclude it, because the remedy was intended, or provided, (and so it is expressed,) especially for the case of a surety who could not conveniently discharge the debt himself, and have his regular recourse over, at once, by the action of *mandatum*. It was a benevolent provision, in that view, and just in no other. In other

arose between *Titius* and the guardians of the orphan child of *Mævius*, was, whether the part of the house so pledged, could be exonerated; there being, as it would seem, no time fixed, by the agreement of the parties, for that purpose. " It is not unlike," says *Marcellus*, " the question so frequently agitated, whether a surety, even before he has paid the debt, can demand to be discharged? He is not obliged," he answers, " to wait until he has paid the debt, or a judgment is given against him, if the debtor has delayed payment a long time, or is wasting his estate; especially, if the surety has not got the money, by the payment of which, to the creditor, he would be entitled to his action, *ex mandato*, against the principal." [*Non absimilis illa quæ frequentissime agitari solet, fidejussor an et prius, quam solvat, agere possit, ut liberetur? Nec tamen semper exspectandum est, ut solvat, aut judicio accepto condemnetur, si diu in solutione reus cessavit, aut certe bona sua dissipavit: præsertim si domi pecuniam fidejussor non habebit, qua numerata creditori mandati actione conveniat.*] *Marcellus* either refers to the case where no day of payment is fixed, and then it is an exception to the general rule, and left to the discretion of the Judge, to be decided according to the circumstances of the case, or to a case where the day of payment was passed; otherwise, the surety, by paying the debt, could not have an action *ex mandato*, against his principal; for, until the surety has paid, and the principal is in default, the implied or *quasi* contract, *ex mandato*, could not arise between them. If the creditor cannot sue the debtor before the day of payment, the surety, whose obligation is accessary merely, can have no better right. Accordingly, *Javolenus* says, (*Dig.* 17. 1. 51.) " though the surety, by mistake, pays the money before the day, he can neither have an action to recover it back, nor an action *ex mandato*, against the debtor, before the day of payment arrives." [*Fidejussor, quamvis per errorem ante diem pecuniam solverit, petere (repetere) tamen ab eo non potest: ac ne mandati quidem actionem; antequam dies solvendi veniat, cum reo habebit.*]

parts of the *Pandects*, (*Dig.* 17. 1. 22. 1. and 46. 1. 31.) *Paul* and *Ulpian* lay down a rule, in respect to sureties, in perfect accordance with the construction I have ventured to adopt, for they say, that if the surety pays before the day, he cannot have recourse over to the debtor until the day of payment has arrived. A number of civilians who have very fully discussed the rights and remedies of sureties under the civil law, and always with this text of *Marcellus* in view, give us no intimation of such a doctrine. The general rule of the civil law was, that the action by the surety against his principal, depended upon his having *paid* the creditor, (*Inst.* 3. 21. 6. and *Ferriere's Inst.* h. t.) and the cases in which he might have recourse over, before payment, were all special cases, as where judgment had already passed against the surety, or the debtor was in failing circumstances, or such a recourse over was part of the original contract, or the debtor had neglected a long time, as from three to ten years, to pay, or the creditor to demand. In all these excepted cases, the surety might sue the debtor for his indemnity or discharge; but *when* might he sue him? Not before the debt was due and payable to the creditor, but before the surety had paid the creditor. The authorities to which I now refer, (*Hub. Prælec.* lib. 3. tit. 21. *De Fide Jussoribus*, 11. *Voet ad Pand.* lib. 46. tit. 1. 34. *Pothier, Trait. des Oblig.* n. 441. *Ersk. Inst.* b. 3. c. 65.) all consider these exceptions as only providing for the relief of the surety, *ante solutionem.* He may sue the principal debtor before he has actually *paid* the debt, and the exceptions were to relieve him from *that* burden, for without one of these special causes, says the *Code*, there would be no foundation, before payment, for the action of *mandatum.* (*Nulla juris ratione, antequam satis creditori pro ea feceris, eum ad solutionem urgeri certum est. Code* 4. 35. 10.) This plain and equitable principle, that until the debtor is in default, either in his contract with the creditor, or in his contract

with the surety, he is not bound to pay or indemnify, seems to pervade equally every part of the civil law.

*Pothier* says, (*ubi sup*. n. 442.) that if the obligation to which the surety has acceded, must, from its nature, exist a long time, as if he was surety for the due execution of a trust, he cannot, within the time, sue the principal debtor or trustee for his discharge, *for he knew, or ought to have known, the nature of the obligation he contracted.* Though where he is surety, indefinitely, as for payment of an annuity, he may, after a long time, as, say ten years, demand that the principal debtor liberate him, by redeeming the annuity.

I cannot make it a condition of the order, staying the sale, that the defendant should repair the dam. This would be a very extraordinary and dangerous interference with the exercise of the rights of a mortgagor, and is, in practice, unknown. Suppose, the most valuable part of the mortgaged premises should consist of buildings, and they should accidentally be destroyed by fire, can the mortgagor be compelled immediately to rebuild? Is it not rather incumbent on the mortgagee, or the surety, to provide for such a case in the contract, or by insurance? It would bring distress and ruin on a mortgagor, to charge him with burdens and duties, not within the contemplation of his contract, and, therefore, not within his provident foresight. How far the Court could, or ought to interfere, in a case of negligent, or permissive waste, rapidly impairing the security, is a question which need not now be discussed; for the relief, if any, would not be by directing the mortgaged premises to be sold for a debt not due, or, under a decree of sale, ~~to~~ *but to* give an order to repair, or a reference to assess damages. The necessity of any interference, of any kind, in cases of mortgages, is exceedingly diminished by the consideration, that the mortgagee can, if he pleases, relieve himself, by obtaining possession of the land, and make, at his own expense, the requisite repairs, for which he would be allow-

ed, in account, when the mortgagor came to redeem.  It is, also, stated, in this case, that the present owner of the equity of redemption is in the act of repairing the dam; and it is so evidently his interest to do it, and his payment of the interest due on the mortgage, together with the costs, is such *decisive evidence, that the property is considered to be worth more than the debt charged thereon*, that I should infer there was little or no foundation for the alarm discovered in the petition.

Motion denied, with costs.

